**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| ALAN D. BUSH, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. H-05-0296 |
| | § | |
| JO ANNE B. BARNHART, Commissioner | § | |
| of the Social Security Administration, | § | |
| | § | |
| *Defendant.* | § | |

**MEMORANDUM AND ORDER**

Pending before the Court are Plaintiff Alan D. Bush ("Bush") and Defendant Jo Anne B. Barnhart's ("Commissioner") cross-motions for summary judgment. Bush appeals the determination of an Administrative Law Judge ("ALJ") that he is not entitled to receive Title XVI supplemental security income benefits. *See* 42 U.S.C. §§ 416(i), 423, 1382c(a)(3)(A). Having reviewed the pending motions, the submissions of the parties, the pleadings, the administrative record, and the applicable law, this Court is of the opinion that Bush's Motion for Summary Judgment (Docket Entry No. 16) should be granted, the Commissioner's Motion for Summary Judgment (Docket Entry No. 17) should be denied, the ALJ's decision denying benefits be reversed, and the case be remanded to the Social Security Administration ("SSA") for further proceedings.

**I.     *Background***

Bush filed an application for supplemental security income payments with the SSA on August 20, 2002, claiming that he had been disabled and unable to work since January 27, 2002. (R. 13, 47). Bush alleged that he suffers from "damage to the nervous system to both legs (knees to feet) [and] pain so bad almost to the point of crying and whole body tremors." (R. 51). After

being denied benefits initially and on reconsideration (R. 27-32, 33-37), Bush requested an administrative hearing before an ALJ. (R. 38).

A hearing was held on September 21, 2004, in Houston, Texas, at which time the ALJ heard testimony from Bush and Karen Nielson, Ph.D., a vocational expert ("VE"). (R. 399-419). In a decision dated October 1, 2004, the ALJ denied Bush's application for benefits. (R. 13-22). On November 24, 2004, Bush appealed the ALJ's decision to the Appeals Council of the SSA's Office of Hearings and Appeals. (R. 8). The Appeals Council, on January 7, 2005, denied the request to review the ALJ's determination. (R. 4-7). This rendered the ALJ's opinion the final decision of the Commissioner. *See Sims v. Apfel*, 530 U.S. 103, 107 (2000). Bush filed this case on January 28, 2005, seeking judicial review of the Commissioner's denial of his claim for benefits. *See* Docket Entry No. 1.

## II.    *Analysis*

### A.    *Statutory Bases for Benefits*

SSI benefits are authorized by Title XVI of the Act and are funded by general tax revenues. *See* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100 (14th ed. 2001). The SSI Program is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line. *See* 20 C.F.R. § 416.110. Eligibility for SSI is based upon proof of indigence and disability. *See* 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C). A claimant applying to the SSI program cannot receive payment for any period of disability predating the month in which he applies for benefits, no matter how long he has actually been disabled. *See Brown v. Apfel*, 192 F.3d 492, 495 n.1 (5th Cir. 1999); *see also* 20 C.F.R. § 416.335. The applicable regulation provides:

> When you file an application in the month that you meet all the other requirements for eligibility, the earliest month for which we can pay you benefits is the month following the month you filed the application.  If you file an application after the month you first meet all the other requirements for eligibility, we cannot pay you for the month in which your application is filed or any months before that month.

20 C.F.R. § 416.335.  Thus, the month following an application, here, August 2002, fixes the earliest date from which benefits can be paid.  (R. 47-49).  Eligibility for SSI payments, however, is not dependent on insured status.  *See* 42 U.S.C. § 1382(a).

**B.**      ***Standard of Review***

     **1.**      ***Summary Judgment***

The court may grant summary judgment under FED. R. CIV. P. 56(c) when the moving party is entitled to judgment as a matter of law because there is no genuine issue as to any material fact. The burden of proof, however, rests with the movant to show that there is no evidence to support the nonmoving party's case.  If a reasonable jury could return a verdict for the nonmoving party, then a motion for summary judgment cannot be granted because there exists a genuine issue of fact.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

An issue of fact is "material" only if its resolution could affect the outcome of the case.  *See Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 189 (5th Cir. 1991).  When deciding whether to grant a motion for summary judgment, the court shall draw all justifiable inferences in favor of the nonmoving party, and deny the motion if there is some evidence to support the nonmoving party's position.  *See McAllister v. Resolution Trust Corp.*, 201 F.3d 570, 574 (5th Cir. 2000).  If there are no issues of material fact, the court shall review any questions of law *de novo*.  *See Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999).  Once the movant properly supports the motion, the burden shifts to the nonmoving party, who must present specific and

supported material facts, of significant probative value, to preclude summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *International Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir. 2000).

### 2.      *Administrative Determination*

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence on the record as a whole and whether the proper legal standards were applied to evaluate the evidence. *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).  "Substantial evidence" means that the evidence must be enough to allow a reasonable mind to support the Commissioner's decision; it must be more than a mere scintilla and less than a preponderance. *See Richardson v. Perales*, 402 U.S. 389, 401 91971; *Masterson*, 309 F.3d at 272; *Brown*, 192 F.3d at 496.

When applying the substantial evidence standard on review, the court "scrutinize[s] the record to determine whether such evidence is present." *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001) (citations omitted).  If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. *See Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002).  Alternatively, a finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision. *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).  The court may not, however, reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *See Masterson*, 309 F.3d at 272.  In short, "[c]onflicts in the evidence are for the Commissioner and not the courts to resolve." *Id*.

4

**C.**     *ALJ's Determination*

An ALJ must engage in a five-step inquiry to determine whether the claimant is capable of performing "substantial gainful activity," or is, in fact, disabled:

1.     An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.  *See* 20 C.F.R. § 416.920(b).

2.     An individual who does not have a "severe impairment" will not be found to be disabled.  *See* 20 C.F.R § 416.920(c).

3.     An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.  *See* 20 C.F.R. § 416.920(d).

4.     If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.  *See* 20 C.F.R. § 416.920(e).

5.     If an individual's impairment precludes performance of his past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed.  *See* 20 C.F.R. § 416.920(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *accord Boyd*, 239 F.3d at 705.  The claimant has the burden to prove disability under the first four steps.  *See Myers*, 238 F.3d at 619.  If the claimant successfully carries this burden, the burden shifts to the Commissioner in step five to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing.  *See Masterson*, 309 F.3d at 272; *Greenspan*, 38 F.3d at 236.  If the Commissioner is able to verify that other work exists in significant numbers in the national economy that the claimant can perform in spite of his or her existing impairments, the burden shifts back to the claimant to prove that he or she cannot, in fact, perform the alternate work suggested.  *See Boyd*, 239 F.3d at 705.  A

finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis.  *See id.*

The mere presence of an impairment does not necessarily establish a disability.  *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992).  An individual claiming disability benefits under the Act has the burden to prove that he suffers from a disability as defined by the Act.  *See Newton*, 209 F.3d at 452; *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990); *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985).  A claimant is deemed disabled under the Act only if he demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Shave v. Apfel*, 238 F.3d 592, 594 (5th Cir. 2001); *accord Newton*, 209 F.3d at 452; *Crowley v. Apfel*, 197 F.3d 194, 197-98 (5th Cir. 1999); *Selders*, 914 F.2d at 618; *see also* 42 U.S.C. § 423(d)(1)(A).  "Substantial gainful activity" is defined as work activity involving significant physical or mental abilities for pay or profit.  *See Newton*, 209 F.3d at 452-53; *see also* 20 C.F.R. § 416.972.

A medically determinable "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  *See Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983); *see also* 42 U.S.C. § 423(d)(3).  "[A]n individual is 'under a disability, only if his impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .'"  *Greenspan*, 38 F.3d at 236 (quoting 42 U.S.C. §

6

423(d)(2)(A)).  This is true regardless of whether such work exists in the immediate area in which the claimant resides, whether a specific job vacancy exists, or whether the claimant would be hired if he applied.  *See Oldham v. Schweiker*, 660 F.2d 1078, 1083 (5th Cir. 1981); *see also* 42 U.S.C. § 423(d)(2)(A).  In the case at bar, when addressing the first four steps, the ALJ determined:

1.  The claimant has not engaged in substantial gainful work since the date of his application.

2.  The claimant has peripheral neuropathy[1] and cerebral ataxia[2] due to alcoholism, a history of knee surgeries, hepatitis C,[3] hypertension,[4] and spurring in the right ankle, severe impairments.  He has tinitis [sic], a history of alcohol abuse (in remission), an anxiety related disorder, and a depressive disorder, non-severe impairments.  He does not have an impairment or combination of impairments that meets or equals in severity the requirements of any of the medical listings in Appendix 1, Subpart P, Regulations No. 4.

3.  The claimant's testimony was not fully credible or consistent with the record considered as a whole.

4.  The claimant has the residual functional capacity to lift and carry less than 10 pounds frequently and 10 pounds occasionally, stand and walk 2 hours of an 8 hour workday, and sit 6 hours of a workday.

---

[1] "Peripheral neuropathy" or "polyneuropathy" refers to a functional disturbance or pathological change in several peripheral nerves simultaneously.  *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1212-1213, 1432 (29th ed. 2000).

[2] "Ataxia" refers to failure of muscular coordination.  *See* DORLAND'S, *supra*, at 165.  "Cerebral ataxia" means ataxia due to disease of the cerebrum.  *See id.*  "Cerebellar ataxia" refers to ataxia due to disease of the cerebellum.  *See id.*

[3] "Hepatitis" refers to an inflammation of the liver.  *See* DORLAND'S, *supra*, at 807.  "Hepatitis C" refers to a viral disease caused by the hepatitis C virus, the most common form of post transfusion hepatitis; it also follows parenteral drug abuse and is a common acute sporadic hepatitis, with approximately 50 per cent of acutely infected persons developing chronic hepatitis.  *See id.* at 808.

[4] "Hypertension" refers to high arterial blood pressure.  *See* DORLAND'S, *supra,* at 858.

5.      The claimant does not have the residual functional capacity to perform his past relevant work.

(R. 21).  As to the fifth step, the ALJ concluded:

6.      The claimant is 46 years of age, defined as a younger individual.

7.      The claimant has a high school education.

8.      In view of the claimant's medical-vocational profile, the issue of transferability of work skills is not determinative of this appeal.

9.      The claimant's medical-vocational profile corresponds with Rule 201.21, Appendix 2, Subpart P, Regulations No. 4, which directs a conclusion of "not disabled," and administrative notice is taken of the fact that jobs that the claimant is capable of performing exist in significant numbers in the national economy.

10.      The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision.

(R. 21-22).

This Court's inquiry is limited to a determination of whether there is substantial evidence in the record to support the ALJ's findings and whether the proper legal standards have been applied. *See Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 215; *Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452; *Greenspan*, 38 F.3d at 236; *see also* 42 U.S.C. §§ 405(g), 1383(c)(3).  To determine whether the decision to deny Bush's claim for disability benefits is supported by substantial evidence, the court weighs the following four factors:  (1) the objective medical facts; (2) the diagnoses and opinions from treating and examining physicians; (3) the claimant's subjective evidence of pain and disability, and any corroboration by family and neighbors; and (4) the claimant's age, educational background, and work history.  *See Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995); *Wren v.*

*Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citing *DePaepe v. Richardson*, 464 F.2d 92, 94 (5th Cir. 1972)).  Any conflicts in the evidence are to be resolved by the ALJ and not the court.  *See Newton*, 209 F.3d at 452; *Brown*, 192 F.3d at 496; *Martinez*, 64 F.3d at 174; *Selders*, 914 F.2d at 617.

**D.** **_Issues Presented_**

Bush contends that the decision of the ALJ is not supported by substantial evidence. Specifically, Bush argues that the ALJ misinterpreted the medical evidence by declining to seek the advice of an appropriately trained medical expert.  Additionally, Bush contends that the ALJ erred by posing an incomplete hypothetical question to the vocational expert and then basing his decision upon the VE's incomplete response.  *See* Docket Entry No. 16.  The Commissioner disagrees with Bush's contentions, maintaining that the ALJ's decision is supported by substantial evidence.  *See* Docket Entry No. 18.

**E.** **_Review of ALJ's Decision_**

**1.** **_Objective Medical Evidence and Opinions of Physicians_**

When assessing a claim for disability benefits, "[i]n the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work."  *Sullivan v. Zebley*, 493 U.S. 521, 525 (1990).  If the claimant is not actually working and her impairments match or are equivalent to one of the listed impairments, she is presumed to be disabled and qualifies for benefits without further inquiry.  *See id.* at 532; *see also* 20 C.F.R. § 416.920(d).  When a claimant has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity."  42 U.S.C. § 423(d)(2)(B); *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000).  The relevant regulations similarly provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.  If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process.  If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled.

20 C.F.R. § 416.923; *see also Loza*, 219 F.3d at 393.  The medical findings of the combined impairments are compared to the listed impairment most similar to the claimant's most severe impairment.  *See Zebley*, 493 U.S. at 531.

The claimant has the burden to prove at step three that his impairment or combination of impairments is equivalent to or greater than a listed impairment.  *See id.* at 530-31; *Selders*, 914 F.2d at 619.  The listings describe a variety of physical and mental illnesses and abnormalities, and are typically categorized by the body system they affect.  *See Zebley*, 493 U.S. at 529-30.  Individual impairments are defined in terms of several specific medical signs, symptoms, or laboratory test results.  *See id.* at 530.  For a claimant to demonstrate that his disorder matches an Appendix 1 listing, it must meet *all* of the specified medical criteria.  *See id.*  An impairment, no matter how severe, does not qualify if that impairment manifests only some of the specified criteria.  *See id.*

For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is equivalent to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment.  *See id.* at 531 (citing 20 C.F.R. § 416.926(a)).  A claimant's disability is equivalent to a listed impairment if the medical findings are at least equal in severity and duration to the listed findings.  *See* 20 C.F.R. § 416.926(a).  The applicable regulation further provides:

(1)(i)   If you have an impairment that is described in the Listing of Impairments in Appendix 1 of Subpart P of this chapter, but—

    (A)   You do not exhibit one or more of the medical findings specified in the particular listing, or

    (B)   You exhibit all of the medical findings, but one or more of the findings is not as severe as specified in the listing;

(ii)   We will nevertheless find that your impairment is medically equivalent to that listing if you have other medical findings related to your impairment that are at least of equal medical significance.

20 C.F.R. § 416.926(a).   Nonetheless, "[a] claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Zebley*, 493 U.S. at 531. Ultimately, the question of equivalence is an issue reserved for the Commissioner. *See Spellman v. Shalala*, 1 F.3d 357 (5th Cir. 1993); 20 C.F.R. § 416.927(e).

A review of the medical records submitted in connection with Bush's administrative hearing reveals a history of hepatitis B and C, alcohol abuse, peripheral neuropathy, ataxia, hypertension, erectile dysfunction, and pain in both knees.  Bush reportedly has been alcohol dependent since 1975, drinking, at times, one-half a liter of liquor (vodka) a day.  (R. 231, 248).  At various intervals, Bush attempted to stop drinking and suffered from alcohol withdrawal.  (R. 231, 238-241).  Bush also reported a history of treatment for gonorrhea and/or syphilis.  (R. 248, 261).

In October 1997, Bush was admitted to the Veterans Administration Medical Center ("VAMC") for alcohol detoxification.  (R. 250-251).  Bush's history of substance abuse (alcohol and

marijuana) was reported.  (R. 248).  At that time, Bush denied any history of psychiatric treatment in the past.  (R. 248, 251).  Bush was evaluated with a global assessment of functioning ("GAF") of 65[5].

In June 1999, a chest x-ray of Bush's lungs was normal.  (R. 255).  Also, Bush underwent a treadmill test and it was noted that, for his age, his exercise tolerance was good.  (R. 256).  He was not taking any medications at that time.  (R. 262, 264).  In December 1999, at Bush's request, Randy Walker, M.D. ("Dr. Walker") wrote a note to Bush's employer explaining that Bush has chronic hepatitis B and C, that fatigue is a side-effect of both diseases, and that absences related to these diseases should be excused.  (R. 257, 262).

In October 2000, Bush visited an urgent care center, complaining of left knee pain.  (R. 230).  An MRI was recommended as well as a follow-up consultation with an orthopedic surgeon.  (R. 230).  In December 2000, an MRI scan of Bush's left knee revealed a medial meniscus tear and partial medial collateral ligament ("MCL") tear.  (R. 229).

Clinical notes dated January 2001, report Bush feeling "nervous and depressed due to some personal problems."  (R. 226).  Bush was diagnosed with "generalized anxiety," a MCL tear in his left knee, and hepatitis C.  (R. 227).  In April 2001, Bush went to a follow-up visit with an orthopedic surgeon.  (R. 224).  Despite the MCL tear in his left knee, Bush reportedly was not having any difficulties with his left knee.  He was able to work without any difficulty.  (R. 224).

---

[5]  A GAF score represents a clinician's judgment of an individual's overall level of functioning.  *See* AMERICAN PSYCHIATRIC ASSOCIATION: DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV-TR") 32 (4th ed. 2000).  The reporting of overall functioning is done by using the GAF Scale, which is divided into ten ranges of functioning—*e.g.*, 90 (absent or minimal symptoms) to 1 (persistent danger of severely hurting self or others, or unable to care for himself).  The GAF rating is within a particular decile if either the symptom severity or the level of functioning falls within the range. Lower GAF scores signify more serious symptoms.  A GAF rating of 65 indicates "some mild" impairment in social, occupational, or school functioning, but generally functioning pretty well.  *See id* at 34.

In May and July 2002, Bush visited the VAMC complaining of pain/numbness in his lower extremities. (R. 215, 219, 221). During his May visit, Bush screened negative for depression. (R. 207). In July 2002, Bush was diagnosed with peripheral neuropathy. (R. 219, 221). Clinical notes from September 2002 assessed Bush as having neuropathy "probably due to alcohol," an MCL tear, hepatitis C, and erectile dysfunction. (R. 213, 218).

On October 11, 2002, Robert M. Gilliland, M.D. ("Dr. Gilliland") completed for the SSA a Psychiatric Review Technique Form, indicating that Bush suffered from a non-severe impairment of substance addiction. (R. 265-278). Dr. Gilliland noted well-documented, on-going alcohol abuse and that a September 2002 depression screen was negative. (R. 273). According to Dr. Gilliland, Bush showed no indication of significant mental impairment apart from active alcohol abuse. (R. 273). This assessment was reviewed and affirmed on June 9, 2003. (R. 265).

In January 2003, Bush continued to complain of progressive numbness in his lower extremities. (R. 179). Bush's medication were adjusted and he was referred to an orthopedic surgeon for a consultation. (R. 179). An x-ray of Bush's left knee revealed a "tiny superior patellar spur since prior exam of 12-10-00." (R. 180). No effusion was observed. (R. 180).

In February 2003, Bush was examined by George M. Isaac, M.D. ("Dr. Isaac"), who is board certified in internal medicine. (R. 279-282). Bush's chief complaints were reported as follows:

> loss of sensation and tingling and numbness and burning pain in both leg[s] from the feet up to the knees with peripheral neuropathy for the past one year, ringing in the ears for the past 2 years, pain in left knee for the past three years, pain in the right knee for the past three months, hepatitis C for the past five years.

(R. 279). Bush advised Dr. Isaac that he had been consuming 12 to 24 beers per week, but that he had cut back to six cans of beer per week. (R. 279). Bush also told Dr. Isaac that, three years prior,

surgery had been recommended to repair a torn cartilage in Bush's knee but was never done. (R. 279).  Bush further reported that he had not received any treatment for his right knee pain. (R. 279).  Dr. Isaac noted Bush to be anxious, nervous, constantly trembling and shaking his hands and legs occasionally.  (R. 280).  Dr. Isaac observed that Bush was able to ambulate the office with his cane only and with a wide-based gait, and had some difficulty getting on the examination table. (R. 280).  Dr. Isaac also reported that Bush had limited flexion of his knees and lumbar spine. (R. 281).  According to Dr. Isaac, Bush was unable to squat or walk on his toes or heels or do tandem walking or hop or stand on either leg alone even with support due to marked unsteadiness.  (R. 281).

Dr. Isaac's impression was that Bush had "peripheral neuropathy with gross unsteadiness and cerebellar ataxia, consider secondary to chronic alcoholism; hepatomegaly, consider secondary to alcoholic cirrhosis of the liver; hypertension, uncontrolled; pain in both knees, consider early osteoarthritis; history of hepatitis C; refractory errors of eyes, uncorrected."  (R. 282).  Dr. Isaac opined that Bush was able to sit and stand, as set forth above, and to lift and carry 5 pounds up to forty feet, with normal reach, feel, and grasp.  (R. 282).  Bush also was able to do repetitive movements of pronation and supination of forearms rapidly for 20 times without fatigue.  (R. 282).

On March 4, 2003, S. Spoor, M.D. ("Dr. Spoor") performed a Physical Residual Functional Capacity Assessment of Bush for the SSA.  (R. 284-291).  In his evaluation, Dr. Spoor found Bush's exertional limitations to be as follows:  occasionally lift and/or carry (including upward pulling) 20 pounds; frequently lift and/or carry (including upward pulling) 10 pounds; stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday; sit (with normal breaks) for a total of about 6 hours in an 8-hour workday; and push and/or pull (including operation of hand and/or foot controls) unlimited, other than as shown for lift and/or carry.  (R. 285).  The evaluation provided the

following postural limitations:  occasional climbing of ramp/stairs, ladder/rope/scaffolds, balancing, stooping, kneeling, crouching and crawling.  (R. 286).  No manipulative, visual, communicative, or environmental limitations were noted.  (R. 287-288).  Dr. Spoor noted that Bush's treating physicians had deferred a hepatitis C treatment plan for Bush until he stopped actively drinking.  (R. 285, 376).  Dr. Spoor concluded that Bush's alleged limitations were not wholly supported.  He also noted that the effects of alcohol abuse were material and the neurological picture was not consistent with medical records in the file and could be an acute syndrome.  (R. 289).  Dr. Spoor's assessment was reviewed and affirmed on June 6, 2003, by Kelvin A. Samaratunga, M.D.  (R. 291)

In April 2003, Bush was hospitalized for alcohol dependence,  delirium tremens with alcohol withdrawal seizures, peripheral neuropathy, and cerebellar degeneration with gait disturbance, and hepatitis C.  (R. 86, 160-166, 293-298).  Hospital records noted that Bush used an assistive device and was considered "at risk" for falling.  (R. 97, 146, 157-158).  Bush was evaluated with a GAF of 54.[6]  (R. 85).  Bush had slight edema, decreased mobility in lower extremities and generalized weakness.  (R. 106).  An examination revealed slightly decreased (4/5) as well as normal (5/5) strength extremities, decreased sensation, and an unsteady gait but equal reflexes.  (R. 145, 154, 167, 389).  A CT scan of Bush's brain revealed "diffuse cerebral and cerebellar atrophy."  (R. 297).  A monopolar needle electrode examination showed electrophysiological evidence suggesting polyneuropathy.  (R. 164, 388).

Clinical notes dated July 15, 2003, indicated that Bush was "feeling low" and he sought treatment for hepatitis C.  (R. 374).  Bush reportedly had managed to "stay clean" for close to three

---

[6]  A GAF rating of 55 indicates a "moderate" impairment in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or coworkers).  *See* DSM-IV-TR, *supra*, at 34.

months, but had been experiencing a depressed mood (without suicidal ideation).  (R. 374).  Bush was evaluated with a GAF of 55.  Bush was prescribed a trial of anti-depressant medication, Citalopram Hydrobromide.  (R. 375).  Bush reportedly was aware that to enroll in the treatment program for hepatitis C, he had to be alcohol free for six months.  (R. 376).  It was further noted that Bush was not able to enroll in the treatment program due to transportation problems (*i.e.*, he was unable to arrange for transportation twice a week).  (R. 375).

In September and October 2003, the record reflects Bush had a three-year history of progressively worsening left knee pain and was ambulating with a cane.  (R. 175, 352, 369).  On October 3, 2003, Bush underwent arthroscopic[7] surgery to repair the medial meniscus tear in his left knee.  (R. 305-308).  Bush continued taking anti-depressant medication.  (R. 362).  At that time, Bush denied having consumed alcohol for the past five months. (R. 369).

In November 2003, Bush continued to have numbness in his lower extremities, but it had reportedly improved considerably with new medication; however, it was reported that Bush continued to use a walker for ambulation.  (R. 346).  At that time, Bush had stopped "actively drinking."  (R. 345).  Bush's assessment was neuropathy, with an etiology related to alcohol as well as possible right knee ligament tear.  (R. 345).  Bush continued taking his anti-depressant medication.  (R. 347).

In March 2004 Bush had arthroscopic surgery performed on his right knee because an MRI showed a possible meniscal tear.  (R. 309-312, 323-324).  The post-operative notes reported no meniscus tear, no ACL tear, and no PCL tear.  (R. 309).  The operative diagnosis was "grade three chondromalacia of the femoral condyle."  (R. 323).  Thus, Bush underwent abrasion chondroplasty

---

[7] "Arthroscopy" refers to an examination of the interior of a joint with an arthroscope.  *See* DORLAND'S, *supra,* at 153.

16

of the medial femoral condyle and medial tibia.  (R. 326-327).  Bush's medication continued to include an anti-depressant.  (R. 327, 333, 342).  Bush's pre-operative screening records indicate that he used an assistive device to walk and was at risk for falling.  (R. 337-338).

Clinical notes dated May 12, 2004, indicated that Bush was being treated for an "active diagnosis of depression."  (R. 320).  Bush's medication continued to include an anti-depressant. (R. 319).  In June 2004, Bush was fitted for a lace-up ankle brace to alleviate chronic right ankle pain. (R. 304).

In August 2004, a physical residual functional capacity questionnaire was completed on Bush by Andrew Kretschmer, M.D. ("Dr. Kretschmer").  (R. 390-394).   He noted that the frequency and length of contact with Bush was fourteen visits within the past five years.  (R. 390).   He diagnosed Bush with neuropathy, chronic pain syndrome, chronic liver disease, and hepatitis C.  (R. 390). Dr. Kretschmer's prognosis of Bush's health was described as poor.  (R. 390).  He concluded that Bush could sit and stand/walk less than 2 hours in an 8-hour work day, could not lift or carry any amount of weight in a work situation, and could not perform the activities of twisting, stooping, crouching/squatting, climbing ladders or stairs.  (R. 392-393).

"[O]rdinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability." *Greenspan*, 38 F.3d at 237; *accord Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).  The opinion of a specialist generally is accorded greater weight *than* that of a non-specialist.  *See Newton*, 209 F.3d at 455; *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994), *overruled on other grounds by Sims v. Apfel*, 530 U.S. 103, 108 (2000).  Medical opinions are given deference, however, only if those opinions are shown

to be more than conclusory and supported by clinical and laboratory findings.  *See Scott*, 770 F.2d at

485.  Moreover, a treating physician's opinions are far from conclusive and may be assigned little or

no weight when good cause is shown.  *See Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Greenspan*,

38 F.3d at 237.   Good cause may permit an ALJ to discount the weight of a treating physician's

opinion in favor of other experts when the treating physician's evidence is conclusory, unsupported

by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by

the evidence.  *See Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 456; *see also Brown*, 192 F.3d at 500;

*Greenspan*, 38 F.3d at 237; *Paul*, 29 F.3d at 211.   It is well settled that even though the opinion and

diagnosis of a treating physician should be afforded considerable weight in determining disability,

the ALJ has sole responsibility for determining a claimant's disability status.  *See Paul*, 29 F.3d at

211; *accord Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 455.

In the present case, the ALJ improperly rejected and/or accorded little weight to the findings

and opinions of Drs. Isaac and Kretschmer without considering the factors set forth in 20 C.F.R.

§ 416.927.  (R.18).   The Fifth Circuit has made clear that even if a treating physician' s report is

not entitled to controlling weight, the ALJ must still evaluate it under the factors applicable to the

consideration of all medical evidence.  *See Newton*, 209 F.3d at 456.  Specifically, in *Newton*, the

court held:

> absent reliable medical evidence from a treating or examining physician controverting
> the claimant' s treating specialist, an ALJ may reject the opinion of the treating
> physician *only* if the ALJ performs a detailed analysis of the treating physician' s
> views under the criteria set forth in 20 C.F.R. § 1527(d)(2).   Additionally, if the ALJ
> determines that the treating physician' s records are inconclusive or otherwise
> inadequate to receive controlling weight, absent other medical opinion evidence based
> on personal examination or treatment of the claimant, the ALJ must seek clarification
> or additional evidence from the treating physician in accordance with 20 C.F.R.
> § 404.1512(e).

*Id.* at 453 (emphasis in original); *accord Barrientoz v. Massanari*, 202 F. Supp. 2d 577, 591 (W.D. Tex. 2002).

In his decision, the ALJ made reference to Bush's "cerebral ataxia," chiding that "there is no Listing for cerebral ataxia. (R. 14, 21). Although correct in noting there is no such listing, Bush's problems stem from cerebellar atrophy. In April 2003, computerized tomographic scanning, while disclosing cerebral atrophy, had confirmed the presence of diffuse cerebellar atrophy, as well. (R. 297). Additionally, a monopolar needle electrode examination showed electrophysiological evidence suggesting polyneuropathy. (R. 164, 388).

The ALJ further erred by attributing Bush's motor difficulties, and the need for an assistive device, to his bilaterally degenerative knees as opposed to peripheral neuropathy. (R. 19, 175). Contrary to the ALJ's assertion (R. 15), the medical records support Bush's need for an assistive device. In February 2003, Dr. Isaac noted that Bush was able to ambulate around the office "with his cane only" and, at that, "with wide-based gait." (R. 280). Bush was unable to stand unassisted or complete the range of motion testing due to his "gross unsteadiness and loss of balance." (R. 280). Dr. Isaac noted pronounced, widespread loss of sensation, including proprioception, from Bush's feet to his knees bilaterally. (R. 280). Dr. Isaac noted Bush's need for an assistive device to be secondary to gross unsteadiness owing to peripheral neuropathy. (R. 282).

Bush's motor dysfunction is well-documented in the record. In November 2003, Bush complained of numbness in his lower extremities. Despite being alcohol free, it was noted that Bush was using a walking cane to ambulate and continued to experience widespread numbness in both legs. (R. 345-346). Bush's Romberg sign was extreme, as he was unable to stand with his feet closer than one foot apart and, then, with a cane for balance only. (R. 280). In August 2004, Dr. Kretschmer

found that Bush had neuropathy, noting continuing peripheral pain and paresthesia as well as emphasizing the need for an assistive device when standing/walking. (R. 390-392). Dr. Kretschmer further reported a multitude of limitations upon Bush's motor functioning. (R. 391-393). Aside from the opinion of a non-examining, State Agency reviewing physician (*i.e.*, Dr. Spoor), the ALJ offered no refuting medical opinion to contradict the examination findings of Drs. Isaac and Kretschmer.

Because the ALJ's decision is not supported by substantial evidence, this case must be remanded for further development regarding Bush's peripheral neuropathy, motor dysfunction, and need for assistive devices to ambulate. It may be of benefit to the ALJ to have a medical expert present at any new administrative hearing to properly review and evaluate the medical evidence.

### 2.    *Subjective Complaints*

The law requires the ALJ to make affirmative findings regarding a claimant's subjective complaints. *See Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994) (citing *Scharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1981)). When a plaintiff alleges disability resulting from pain, he must establish a medically determinable impairment that is capable of producing disabling pain. *See Ripley*, 67 F.3d at 556 (citing 20 C.F.R. § 404.1529). Once a medical impairment is established, the subjective complaints of pain must be considered along with the medical evidence in determining the individual's work capacity. *See id.* It is well settled that an ALJ's credibility findings on a claimant's subjective complaints are entitled to deference. *See Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Scott v. Shalala*, 30 F.3d 33, 35 n.2 (5th Cir. 1994); *Falco*, 27 F.3d at 164; *Wren*, 925 F.2d at 128. The Fifth Circuit recognizes that "the ALJ is best positioned" to make these determinations because of the opportunity to observe the claimant first-hand. *See Falco*, 27

20

F.3d at 164 n.18.   Moreover, " [t]he Act, regulations and case law mandate that the Secretary require that subjective complaints be corroborated, at least in part, by objective medical findings." *Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir. 1988) (citing 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529; *Owens v. Heckler*, 770 F.2d 1276, 1281-82 (5th Cir. 1985)); *accord Chambliss*, 269 F.3d at 522 (citing *Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989)); *Hampton v. Bowen*, 785 F.2d 1308, 1309 (5th Cir. 1986).

As a matter of law, the mere fact that working may cause a claimant pain or discomfort does not mandate a finding of disability.   *See Hames*, 707 F.2d at 166; *Epps v. Harris*, 624 F.2d 1267, 1274 (5th Cir. 1980); *accord Brown v. Bowen*, 794 F.2d 703, 707 (D.C. Cir. 1986).   Additionally, the mere existence of pain does not automatically bring a finding of disability.   *Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989); *Owens*, 770 F.2d at 1281.   It must be determined whether substantial evidence indicates an applicant can work despite being in pain or discomfort.   *See Chambliss*, 269 F.3d at 522; *Johnson v. Heckler*, 767 F.2d 180, 182 (5th Cir. 1985).

For pain to rise to the level of disabling, that pain must be " constant, unremitting, and wholly unresponsive to therapeutic treatment." *Chambliss*, 269 F.3d at 522; *Falco*, 27 F.3d at 163; *Wren*, 925 F.2d at 128.   The decision arising from the ALJ' s discretion to determine whether pain is disabling is entitled to considerable deference.   *See Chambliss*, 269 F.3d at 522; *Wren*, 925 F.2d at 128; *James*, 793 F.2d at 706.   However, an ALJ may discount subjective complaints of pain as inconsistent with other evidence in the record.   *Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003) (citing *Wren*, 925 F.2d at 128 (citation omitted)).

At the administrative hearing, Bush testified regarding his complaints of pain.  (R. 405-412).

21

> Q:      . . . And can you tell the Court, in your own words, what problems you're having at the current time that keep you from doing any kind of work at all?
>
> A:      Well, my – the neuropathy has affected my both right and left legs and – to the point where it's continuous pain.  It never lets up and it just – I can't sit of stand very long.  It hasn't – it gives me a little trouble maybe with the medications too.  I'm not sure, but with the – we have a lot of time – have a hard time controlling my bowel movements, but it – I – my concentration is disrupted a lot with the pain.

(R. 405).  The ALJ, however, found Bush's testimony regarding his subjective complaints was not "fully credible but somewhat exaggerated." (R. 20).  Contrary to the ALJ's reasoning, the record is replete with reports of Bush experiencing chronic leg pain.  (R. 175, 179, 214-215, 219, 221, 223-225, 230, 253, 279, 282, 304, 326, 330, 334, 346, 352-353, 369-370, 390).  Bush had an almost three-year history of left knee pain and a four month history of right knee pain.  (R. 175).  Bush reported he had "continuous pain in lower extremities especially at night." (R. 221).  Bush complained of "pain/numbness in lower extremities for the last 3 months." (R. 223).  The record reveals Bush had "sharp, aching pain in the right knee lasting approximately 4 to 5 hours." (R. 323).  The physical residual capacity questionnaire completed by Dr. Kretschmer noted Bush had symptoms of fatigue, pain, and chronic leg pain.  (R.390).  Because he ALJ's findings as to Bush's subjective complaints are contradicted by the record as a whole, this case must be remanded for further development regarding the extent of pain experienced by Bush as well as work limitations, if any, such pain imposes on Bush.

### 3.     *Residual Functional Capacity*

Under the Act, a person is considered disabled:

only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education,

and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  If a claimant demonstrates that he cannot perform his past relevant work, the Commissioner bears the burden of proving that his functional capacity, age, education, and work experience allow him to perform work in the national economy.  *See Brown v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 216; *Myers*, 238 F.3d at 619; *Greenspan*, 38 F.3d at 236.  Once the Commissioner fulfills this burden by pointing out potential alternative employment, the claimant, in order to prevail, must prove that he cannot perform the alternate work suggested.  *See Masterson*, 309 F.3d at 272; *Boyd*, 239 F.3d at 705; *Shave*, 238 F.3d at 594; *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

To determine whether an applicant can return to a former job or, if never employed, can perform substantial work in the national economy, the regulations require the ALJ to evaluate the applicant's RFC.  *See Carter v. Heckler*, 712 F.2d 137, 140 (5th Cir. 1983) (citing 20 C.F.R. §§ 404.1561, 416.961).  This term of art merely designates the ability to work despite physical or mental impairments.  *See id.*; *see also* 20 C.F.R. §§ 404.1545, 416.945.  "Residual functional capacity" combines a medical assessment with the descriptions by physicians, the applicant or others of any limitations on the applicant's ability to work.  *See id.*  When a claimant's RFC is not sufficient to permit him to continue his former work, then his age, education, and work experience must be considered in evaluating whether he is capable of performing any other work.  *See* 20 C.F.R. §§ 404.1561, 416.961.  The testimony of a vocational expert is valuable in this regard, as "he is familiar with the specific requirements of a particular occupation, including working

conditions and the attributes and skills needed." *Carey*, 230 F.3d at 145; *see also Masterson*, 309 F.3d at 273; *Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995); *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986). In the absence of contrary evidence, the ALJ may properly rely on the testimony of a vocational expert in reaching a conclusion regarding a claimant's RFC to perform work available in the national economy. *See Masterson*, 309 F.3d at 273.

Moreover, under certain circumstances, the ALJ's application of the medical-vocational guidelines set forth in Appendix 2 of Subpart P of the Regulations, also referred to as the grids, without testimony from a vocational expert, is sufficient to assess whether a claimant is able to work or is disabled under the Act. *See Heckler v. Campbell*, 461 U.S. 458, 467, 470 (1983). As the Supreme Court explained in *Campbell*:

> These guidelines relieve the Secretary of the need to rely on vocational experts by establishing through rulemaking the types and numbers of jobs that exist in the national economy. They consist of a matrix of the four factors identified by Congress—physical ability, age, education, and work experience—and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy. Where a claimant's qualifications correspond to the job requirements identified by a rule, the guidelines direct a conclusion as to whether work exists that the claimant could perform. If such work exists, the claimant is not considered disabled.

*Id*. at 461-62 (footnotes omitted). The Court elaborated:

> Each of these four factors is divided into defined categories. A person's ability to perform physical tasks, for example, is categorized according to the physical exertion requirements necessary to perform varying classes of jobs—*i.e.*, whether a claimant can perform sedentary, light, medium, heavy, or very heavy work. 20 C.F.R. § 404.1567. Each of these work categories is defined in terms of the physical demands it places on a worker, such as the weight of objects he must lift and whether extensive movement or use of arm and leg controls is required. *Ibid*.

*Id.* at 462 n.3.

Under the regulations, impairments can be either exertional or nonexertional. *See Sykes v. Apfel*, 228 F.3d 259, 263 (3d Cir. 2000). Impairments are classified as exertional if they affect the claimant's ability to meet the strength demands of jobs. *Id.* The classification of a limitation as exertional is related to the United States Department of Labor's classification of jobs by various exertional levels (sedentary, light, medium, heavy, and very heavy) in terms of the strength demands for sitting, standing, walking, lifting, carrying, pushing, and pulling. *See id.*; *see also* 20 C.F.R. § 404.1569a(b). All other work-related limitations and restrictions (mental abilities, vision, hearing, speech, climbing, balancing, stooping, kneeling, crouching, crawling, reaching, handling, fingering, feeling, and environmental restrictions) are classified as nonexertional. *See Sykes*, 228 F.3d at 263; *see also* 20 C.F.R. § 404.1569a(c); SSR 96-9p, 1996 WL 374185, at *5 (S.S.A. July 2, 1996).

In evaluating RFC, the Fifth Circuit has looked to SSA rulings ("SSR"). The Social Security Administration's rulings are not binding on this Court, but they may be consulted when the statute at issue provides little guidance.[8] *See Myers*, 238 F.3d at 620 (citing *B.B. ex rel. A.L.B. v. Schweiker*, 643 F.2d 1069, 1071 (5th Cir. 1981)). In *Myers*, the Fifth Circuit relied on SSRs addressing residual functional capacity and the interplay of exertional and nonexertional factors:

> First, SSR 96-8p provides that a residual functional capacity (RFC) "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." "The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." "However, without the initial function-by-function assessment of the

---

[8] While SSRs do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSR "binding on all components of the Social Security Administration." *See* 20 C.F.R. § 402.35(b)(1). "These rulings represent precedent final opinions and orders and statements of policy and interpretations that [the SSA] has adopted." *Id.*

individual's physical and mental capacities, it may not be possible to determine whether the individual is able to do past relevant work. . . ." RFC involves both exertional and nonexertional factors. Exertional capacity involves seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling. "Each function must be considered separately." "In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis. . . ." The RFC assessment must include a resolution of any inconsistencies in the evidence.

*Id.* (quoting 61 Fed. Reg. 34474-01 (July 2, 1996)). The court also noted that SSR 96-9p defines exertional capacity as the aforementioned seven strength demands and requires that the individual's capacity to do them on a regular continuing basis be stated. *See id.* Thus, to determine that an applicant can do a given type of work, the ALJ must find that the applicant can meet the job's exertional and nonexertional requirements on a sustained basis and can maintain regular employment. *See Watson*, 288 F.3d at 218; *Singletary v. Bowen*, 798 F.2d 818, 821 (5th Cir. 1986); *Carter*, 712 F.2d at 142 (citing *Dubose v. Mathews*, 545 F.2d 975, 977-78 (5th Cir. 1977)).

When a claimant suffers only exertional impairments and an ALJ's findings of residual functional capacity, age, education, and previous work experience coincide with the grids, the Commissioner may rely exclusively on the medical-vocational guidelines to determine whether work exists in the national economy which the claimant can perform. *See Newton*, 209 F.3d at 458 (citing *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987); 20 C.F.R. § 404.1569(b)). Nevertheless, use of the grid rules is appropriate only when it is established that the claimant suffers only from exertional impairments, or that the claimant's nonexertional impairments do not significantly affect his or her residual functional capacity. *See Crowley*, 197 F.3d at 199; *accord Watson*, 288 F.3d at 216; *Loza v. Apfel*, 219 F.3d 378, 398 (5th Cir. 2000); *Newton*, 209 F.3d at 458. If the claimant suffers from nonexertional impairments or a combination of exertional and nonexertional

26

impairments, then the Commissioner must rely on a vocational expert to establish that suitable jobs exist in the economy.  *See id.*  Therefore, before applying the grids, it must be determined whether nonexertional factors, such as mental illness, significantly affect a claimant's RFC.  *See Loza*, 219 F.3d at 399; *Newton*, 209 F.3d at 459.

In the case at bar, the ALJ failed to formulate hypothetical questions for the VE that encompassed all of Bush's recognized limitations.  The ALJ posed the following questions to the VE:

> Q:    Okay.  So if we had an individual – Ms. Nielson, I'll give you some hypothetical questions.  If we had an individual who's the same age, education, vocational history as this Claimant, who's limited to sedentary work as defined by the Commission, that means could occasionally lift and carry 10 pounds, frequently lift and carry up to 10 pounds, standing and walk with normal breaks at least two hours in an eight work day, that individual would not be able to perform the Claimant's past relevant work, is that correct?
>
> A:    He would not be able to, yes.
>
> Q:    Okay.  On the other hand, I – if I look at the – at 9F, Mr. Makris, that is the residual functional capacity questionnaire, it indicates the Claimant could sit for 15 minutes and stand for 15 minutes and could sit, stand and walk for a total of less than two hours in an eight hour day.  So if that were the case, if that were the hypothetical, Ms. Nielson, that would eliminate the Claimant's past relevant work and all –
>
> A:    Other, yes.
>
> Q:    – competitive work, is that correct?
>
> A:    Yes, sir.

(R. 416-417).  No further questions were asked of the VE.

Only where the testimony by the VE is based on a correct account of a claimant's qualifications and restrictions, may an ALJ properly rely on the VE's testimony and conclusion. *See Leggett v.*

*Chater*, 67 F.3d 558, 565 (5th Cir. 1995).  Unless there is evidence in the record to adequately support the assumptions made by a VE, the opinion expressed by the VE is meaningless.  *See Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).  Here, the ALJ failed to formulate a hypothetical question to the VE that incorporated Bush's need for a walker or other assistive device or even considered the impact of Bush's balance problems.  Because the ALJ relied on testimony elicited by a defective hypothetical question, the ALJ did not carry his burden to show that despite the claimant's impairments, the claimant can perform available work.  *See Boyd*, 239 F.3d at 708.

Finally, the ALJ's sole reliance upon the Medical-Vocational Guidelines, commonly referred to as the "grid rules" was improper.[9]  (R. 21).  As set forth, *supra*, the ALJ improperly discredited Bush's assertions of pain.  While this Court recognizes that pain is not a *per se* nonexertional impairment, the ALJ failed to properly consider Bush's pain allegations and/or their impact.  To the extent the records is replete with references to Bush suffering from pain, the ALJ should have analyzed whether it constitutes a nonexertional impairment and, if so, produced expert vocational testimony or other similar evidence to establish that such jobs exist that Bush was capable of performing.  *See Scott*, 30 F.3d at 35; *Selders,* 914 F.2d at 618; *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988); *Fraga*, 810 F.2d at 1304 (citing *Lawler v. Heckler*, 761 F.2d 195, 198 (5th Cir.1985)); *Fields*, 805 F.2d at1170.

In the case at bar, the ALJ failed to produce evidence, apart from the Grids, that jobs existed in significant numbers that Bush could perform.  Indeed, the VE testified unfavorably, noting there

---

[9]  The Grids allow the Commissioner to take "administrative notice" of the availability of jobs that exist in the national economy that can be performed by individuals at various function levels (*i.e.*, sedentary, light, medium, heavy, and very heavy) in *lieu* of calling a VE to testify.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200(b); *see also Campbell*, 461 U.S. at 467& 470; *Harrell*, 862 F.2d at 478.

was no work Bush could perform.  (R. 416-417).  The VE did not testify as to any functional

conclusion. (R. 416-417).  Moreover, review of the administrative record discloses no substantial

evidence that Bush can perform sedentary work based on his alleged limitations.  In the absence,

as here, of clear testimony from the VE, or other credible evidence in the record that jobs existed

in significant numbers in the national economy to accommodate Bush's limitations, substantial

evidence to support the ALJ's finding of no disability is lacking, and the Commissioner has failed

to meet her burden of proof on this issue.  As such, the case must be remanded.

### III.   *Conclusion*

Accordingly, it is therefore

**ORDERED** that Bush's Motion for Summary Judgment is **GRANTED**.  It is further

**ORDERED** that the Commissioner's Motion for Summary Judgment is **DENIED**.  It finally

**ORDERED** that the case is **REVERSED** and **REMANDED** to the Commissioner for a new

hearing on the following: development, if necessary by a medical doctor, regarding Bush's peripheral

neuropathy, motor dysfunction, and need for assistive devices to ambulate; proper consideration of the

extent of pain experienced by Bush and work limitations, if any, such pain imposes on Bush;

formulation of clear testimony from a VE regarding jobs, if any, Bush is capable of performing

considering all of his limitations.

**SIGNED** at Houston, Texas, this 3rd day of March, 2006.

Calvin Botley
United States Magistrate Judge